UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

PAUL LEPORE, individually and on behalf of all others similarly situated,

*Plaintiff*,

— against —

MOLEKULE, INC.,

*Defendant*.

20-CV-2571 (ARR) (ST)

OPINION & ORDER

ROSS, United States District Judge:

Plaintiff, Paul Lepore, commenced this class action against defendant, Molekule, Inc. ("Molekule"), on June 9, 2020. Compl., ECF No. 1. Lepore's amended complaint, filed on October 30, 2020, alleges that Molekule has made false and misleading representations to consumers regarding the efficacy of its air purifier products. Am. Compl., ECF No. 16. Molekule moves to compel arbitration and to dismiss or, in the alternative, stay the case. Def.'s Mot. Compel Arb., ECF No. 19-1 ("Def.'s Mot."). For the reasons set forth below, I grant Molekule's motion to compel and I stay this action pending arbitration.

## FACTUAL BACKGROUND

Defendant Molekule, a Delaware corporation with a principal place of business in California, manufactures and markets air purifiers ("Products"). Am. Compl. ¶¶ 1, 43. Molekule claims that its Products, employing patented Photo Electrochemcial Oxidation ("PECO") technology, "eliminate dust, pollen and other contaminates" and are "superior to . . . High Efficiency Particular Arresting [("HEPA")] air purifiers for removing allergens from the home." *Id.* ¶¶ 1–4, 10. Molekule "conspicuous[ly] claims" that "several Products . . . will 'destroy' germs

and 'eliminate' indoor air pollution." *Id.* ¶¶ 2, 7 (Molekule "claim[s] that the air purifiers will completely eliminate indoor air pollution").

Plaintiff Lepore, a citizen of New York, purchased an air purifier (the "Product") from Molekule's website (the "Site") in October 2017. *Id.* ¶¶ 41–42. In September 2018, Lepore purchased replacement air filters for the Product, again from Molekule's Site. Pl.'s Opp'n 1, ECF No. 25. In order to purchase these replacement filters, Lepore "was required to create an account on Defendant's website and click a box on Defendant's website indicating assent to certain Terms and Conditions" (the "2018 T&C"). *Id.* at 1, 5–6 ("This clickthrough box . . . was required to complete the purchase [of the replacement air filters]."). Lepore did not agree to the 2018 T&C "when he first purchased the Product in October 2017." *Id.* at 1.

At the time that Lepore purchased the replacement filters, "the relevant portion of the screen that customers saw when creating a Molekule account via the Molekule website" (the "2018 Account Creation Screen") appeared as follows:

**Create your Molekule account**

Your Molekule account will allow you to manage your filter auto-refills. Please enter the email address used to purchase your Molekule device.

Your password should:
- Be at least 8 characters
- Include at least one capital letter
- Include at least one lowercase letter
- Include at least one number
- Include at least one special character

Email address (used at purchase)

Create password

Confirm password

○ Accept **Terms and Conditions**

CREATE ACCOUNT

→ Already have an account?

2

Huq Decl. ¶ 7, ECF No. 19-2. The bolded "Accept **Terms and Conditions**" language included a hyperlink to the 2018 T&C. *Id.*; Pl.'s Opp'n 5–6. The green "CREATE ACCOUNT" button was "'grayed out' or inoperable when the checkbox next to the 'Accept **Terms and Conditions**' language was unchecked." Huq Decl. ¶ 8. Users were required to affirmatively check the (circular) checkbox first before they could click on the green button to create an account. *Id.*; Pl.'s Opp'n 1, 5–6.

The 2018 T&C state that they "govern your use of our Site and our mobile application (the 'App'), and the purchase and use of our products available on our Site or App (the 'Products')." Huq Decl., Ex. A at 1–2, ECF No. 19-3.[1] The introductory paragraphs of the 2018 T&C include an "ARBITRATION NOTICE" that consists of the following language:

> UNLESS YOU OPT OUT OF ARBITRATION WITHIN 30 DAYS OF THE DATE YOU FIRST AGREE TO THESE TERMS BY FOLLOWING THE OPTOUT PROCEDURE SPECIFIED IN THE "ARBITRATION" SECTION BELOW, AND EXCEPT FOR CERTAIN TYPES OF DISPUTES DESCRIBED IN THE "ARBITRATION" SECTION BELOW, YOU AGREE THAT DISPUTES BETWEEN YOU AND Molekule WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION AND YOU ARE WAIVING YOUR RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION OR REPRESENTATIVE PROCEEDING.

*Id.* at 2. The "Agreement to Arbitrate" subsection is located within the "Dispute Resolution" section of the 2018 T&C, and it further provides that "[y]ou and Molekule agree that any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services or Content (collectively, 'Disputes') will be settled by binding arbitration." *Id.* at 8; Pl.'s Opp'n 7.[2] The "Agreement to

---

[1] "[T]he Site, the Products and the App are collectively called the 'Services'" throughout the 2018 T&C. Huq Decl., Ex. A at 2.

[2] The "Agreement to Arbitrate" is subject to two exceptions that are undisputedly not relevant

3

Arbitrate" subsection reiterates that failure to opt out within the thirty-day period referred to in the "ARBITRATION NOTICE" above constitutes "knowing[] and intentional[] waive[r]" of "your right to litigate any Dispute" and an "acknowledg[ment] and agree[ment] that you and Molekule are each waiving the right to a trial by jury or to participate as a plaintiff or class member in any purported class action or representative proceeding." Huq Decl., Ex. A at 8.[3] The "Dispute Resolution" section of the 2018 T&C then sets forth the processes and procedures for arbitrations under the 2018 T&C, providing that any "arbitration will be administered by the American Arbitration Association . . . in accordance with the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes . . . then in effect." *Id.* at 9–10; *see* Am. Arb. Ass'n, *Commercial Arbitration Rules and Mediation Procedures* (effective Oct. 1, 2013), https://www.adr.org/sites/default/files/Commercial-Rules-Web.pdf (the "AAA Rules").[4]

The "Governing Law" subsection of the "Dispute Resolution" section of the 2018 T&C provides that "[t]hese Terms and any action related thereto will be governed by the laws of the State of California without regard to its conflict of laws provisions." Huq Decl., Ex. A at 8.

**PROCEDURAL BACKGROUND**

Lepore filed this class action on June 9, 2020, Compl., later amending his complaint on

---

here: individual actions brought in small claims court and equitable relief brought to protect Molekule's intellectual property. *Id.* at 8.

[3] Lepore has not disputed Molekule's assertion that he did not opt out of arbitration in accordance with the terms of the 2018 T&C. *See* Def.'s Mot. 2, 4, 12; Def.'s Reply 1, 11, ECF No. 26; Kershner Decl. ¶ 5, ECF No. 19-5.

[4] I take judicial notice of the AAA Rules as they are "not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Klein v. ATP Flight Sch., LLP*, No. 14-CV-1522 (JFB) (GRB), 2014 WL 3013294, at *10 & n.6 (E.D.N.Y. July 3, 2014) (quoting Fed. R. Evid. 201(b)(2)); *see also, e.g.*, *Barbieri v. K-Sea Transp. Corp.*, No. 05-CV-4950 (EVN) (MDG), 2006 WL 3751215, at *2 n.5 (E.D.N.Y. Dec. 19, 2006).

4

October 30, 2020, Am. Compl. Lepore alleges that Molekule has falsely "advertised and represented to consumers that the Products were more effective at eliminating airborne pollutants and allergens than the Products were." *Id.* ¶¶ 7–23, 58, 62, 77. He further alleges that, "on account of its representations," Molekule "charges a price premium" for its Products as "[c]ompared to non-deceptively advertised air filters." *Id.* ¶ 26. Lepore relied on Molekule's misrepresentations and thus "paid that price premium" for the Product, but "[t]he value of the Product that plaintiff purchased and used was materially less than its value as represented by defendant." *Id.* ¶ 26–28. Ultimately, Lepore "would not have bought the Product[] or would have paid less for [it]" had he "known the truth." *Id.* ¶ 29.

Lepore asserts multiple claims for (1) deceptive business practices and false advertising under N.Y. Gen. Bus. Law §§ 349 and 350, (2) negligent misrepresentation, (3) breaches of express warranty, implied warranty of merchantability, and the Magnuson Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, (4) fraud, and (5) unjust enrichment. *Id.* ¶¶ 55–81. He brings these claims on behalf of himself as well as putative New York and nationwide classes of individuals who purchased Molekule's Products during the applicable statutes of limitations. *Id.* ¶ 46. Lepore also seeks class-wide injunctive relief. *Id.* ¶¶ 47, 54.

On November 13, 2020, Molekule filed a motion to compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, Def.'s Mot., as well as a pre-motion letter requesting a conference regarding an anticipated motion to dismiss, Def.'s Letter, ECF No. 17. On November 16, 2020, I set a schedule to complete briefing on Molekule's motion to compel while staying briefing on defendant's pre-motion letter. Text Order (Nov. 16, 2020). Molekule's motion seeks to "compel[] the individual arbitration of all claims" brought by Lepore and to "dismiss[] . . . or,

5

alternatively, stay[] proceedings pending completion of arbitration." Def.'s Mot. 1, 15.[5] Molekule argues that because the 2018 T&C "contain a valid and enforceable arbitration agreement and class-action waiver, Lepore must submit his claims against Molekule to arbitration on an individual basis." *Id.* at 1–2. Molekule further contends that the parties agreed to delegate threshold questions of arbitrability to the arbitrator, *id.* at 7–10, though Molekule contends that Lepore's claims nonetheless fall within the scope of the parties' agreement to arbitrate, *id.* at 13–15.

On November 30, 2020, Lepore filed an opposition to Molekule's motion to compel. Pl.'s Opp'n. Lepore appears to argue both that the arbitration agreement in the 2018 T&C was unclear and inconspicuous such that he should not be considered to have agreed to it and that, at most, it "applies only to disputes that arise out of Plaintiff's purchase of replacement filters," not "retroactively . . . to his purchase of the Product itself." *Id.* at 2–6. Lepore also contends that the arbitration agreement is unconscionable. *Id.* at 6–9. Finally, Lepore maintains that "the issue of whether the parties agreed to arbitrate the question of arbitrability need not be answered" because the 2018 T&C "represented an unconscionable and void contract." *Id.* at 9–10.

On December 7, 2020, Molekule filed a reply. Def.'s Reply. Molekule reiterates that the 2018 T&C constitute a valid and enforceable clickwrap agreement and thus, because they "contain a clear and unmistakable delegation provision, which requires the arbitrator to determine 'gateway' arbitrability questions," I "need not consider Lepore's arguments regarding unconscionability and the scope of the arbitration agreement." *Id.* at 1–6 (citation and quotation marks omitted). Alternatively, Molekule argues that those arguments fail on their own terms. *Id.* at 6–11. Molekule

---

[5] The motion also sought to "immediately stay[] any further proceedings in this case pending resolution of this motion." Def.'s Mot. 1. On November 20, 2020, Judge Steven Tiscione held an initial conference with the parties and directed them to exchange Rule 26(a) initial disclosures by December 11, 2020. Minute Entry, ECF No. 24. Judge Tiscione further ordered the parties to submit a proposed schedule for the rest of discovery only after I rule on the instant motion. *Id.*

also notes that Lepore did not address its request to dismiss this action, rather than stay the proceedings, "in the event that [I] compel[] arbitration." *Id.* at 11.

## STANDARD OF REVIEW

In deciding a motion to compel arbitration under the FAA, "the court applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). Accordingly, I evaluate "allegations related to arbitrability . . . to determine 'whether they raise a genuine issue of material fact that must be resolved by a fact-finder at trial.'" *Arnaud v. Doctor's Assocs. Inc.*, No. 18-CV-3703 (NGG) (SJB), 2019 WL 4279268, at *4 (E.D.N.Y. Sept. 10, 2019) (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012)), *aff'd*, 821 F. App'x 54 (2d Cir. 2020) (summary order). In doing so, I must "consider all relevant, admissible evidence submitted by the parties" and "draw all reasonable inferences in favor of the non-moving party." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (citation omitted). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Bensadoun*, 316 F.3d at 175. "[B]ut where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [I] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Nicosia*, 834 F.3d at 229 (citation and quotation marks omitted).

## DISCUSSION

The FAA mandates that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The statute "reflects 'a liberal federal policy favoring arbitration agreements.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011)). "As a result[,] 'any doubts concerning the scope of arbitrable issues

should be resolved in favor of arbitration,' . . . , and courts should 'construe arbitration clauses as broadly as possible.'" *Wells Fargo Advisors, L.L.C. v. Tucker*, 195 F. Supp. 3d 543, 546 (S.D.N.Y. 2016) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 250 (2d Cir. 1991)), *aff'd sub nom. Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392 (2d Cir. 2018).

Under the FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition [the] . . . district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. Nonetheless, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). "Thus, before an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties." *Meyer*, 868 F.3d at 73; *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."). The party seeking to compel arbitration bears "the initial burden of showing that an agreement to arbitrate exists." *Carvant Fin. LLC v. Autoguard Advantage Corp.*, 958 F. Supp. 2d 390, 395 (E.D.N.Y. 2013); *see Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order); *Dreyfuss v. Etelecare Glob. Sols.-U.S. Inc.*, 349 F. App'x 551, 554–5 (2d Cir. 2009) (summary order). Subsequently, "the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'" *Hines*, 380 F. App'x at 24 (quoting 9 U.S.C. § 4).

Ordinarily, "upon being satisfied" that the parties have indeed agreed to arbitrate, 9 U.S.C. § 4, I must then determine "whether the particular dispute [sought to be arbitrated] falls within the

8

scope of [the] arbitration clause." *Dodge Hyundai of Paramus v. United Welfare Fund, Welfare Div.*, No. 11-CV-979 (ARR), 2011 WL 4356373, at *3 (E.D.N.Y. Sept. 16, 2011). However, the FAA also "allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." *Henry Schein, Inc.*, 139 S. Ct. at 527. These "threshold" or "gateway" arbitrability questions may include those relating to contract interpretation, enforceability, and validity. *See, e.g.*, *id.* (discussing "the threshold arbitrability question" of "whether the[] [parties'] arbitration agreement applies to the particular dispute"); *McCoy v. Dave & Buster's, Inc.*, No. 15-CV-0465 (JFB) (AYS), 2018 WL 550637, at *6 (E.D.N.Y. Jan. 24, 2018) (explaining that "[s]uch gateway issues include disputes regarding the validity or enforceability of an arbitration agreement"). "[C]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Henry Schein, Inc.*, 139 S. Ct. at 531 (citation and quotation marks omitted). "But if a valid [arbitration] agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Id.* at 530; *see, e.g.*, *Corpus Christi Indep. Sch. Dist. v. Amrisc, LLC*, No. 19-CV-301 (ARR) (JO), 2019 WL 2051696, at *2–4 (E.D.N.Y. May 9, 2019); *McCoy*, 2018 WL 550637, at *7.

**I.      The Parties Entered into an Arbitration Agreement.**

The question "[w]hether the parties agreed to arbitrate . . . is determined by state law." *Biggs v. Midland Credit Mgmt., Inc.*, No. 17-CV-340 (JFB) (ARL), 2018 WL 1225539, at *5 (E.D.N.Y. Mar. 9, 2018); *see also Meyer*, 868 F.3d at 73–74. The 2018 T&C provide that California law will govern "[t]hese Terms and any action related thereto," Huq Decl., Ex. A at 8, and Lepore does not dispute Molekule's contention that "California law should govern the issues of contract formation presented here," Def.'s Mot 11. Thus, I presume that California law applies

9

for the purpose of deciding this question. *See, e.g.*, *Edwards v. Macy's Inc.*, No. 14-CV-8616 (CM) (JLC), 2015 WL 4104718, at *3 (S.D.N.Y. June 30, 2015) (noting that "a lengthy choice of law analysis is not necessary" where "[n]either party disputes" the law that "govern[s] this dispute").

To form a contract under California law, the parties must mutually manifest their assent "by written or spoken word or by conduct." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002). "California contract law measures assent by an objective standard that takes into account both what the offeree said, wrote, or did" as well as "the transactional context." *Id.* at 30. Thus, on the one hand, "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Id.* (citation omitted). But, on the other hand, "[w]here there is no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms." *Meyer*, 868 F.3d at 74–75. "Whether a reasonably prudent user would be on inquiry notice turns on the '[c]larity and conspicuousness of arbitration terms.'" *Id.* at 75 (quoting *Specht*, 306 F.3d at 30). "[I]n the context of web-based contracts, . . . clarity and conspicuousness are a function of the design and content of the relevant interface." *Id.* (citing *Nicosia*, 834 F.3d at 233).

I am satisfied that a "web-based" agreement to arbitrate exists here between Molekule and Lepore because "the notice of the arbitration provision[s] was reasonably conspicuous and [Lepore's] manifestation of assent [was] unambiguous as a matter of law." *Id.* at 75–76. Lepore himself acknowledges that, in 2018, he "create[d] an account on Defendant's website" and "click[ed] a box on Defendant's website indicating assent to" the 2018 T&C. Pl.'s Opp'n 1.[6] But

---

[6] Lepore also does not dispute Molekule's description of the form or substance of either the 2018 Account Creation Screen or the 2018 T&C themselves. *See* Huq Decl., Exs. A–B; Pl.'s Opp'n 5–7.

10

Lepore appears to argue that the arbitration agreement was not "clear and conspicuous," and thus he was not on notice of its terms and should not be bound by them, *id.* at 2–6, "regardless of [this] apparent manifestation of his consent," *Specht*, 306 F.3d at 30. More specifically, Lepore argues that "Defendant does little more than assert that a user need only click a singular button to assent to the myriad terms and conditions contained in Defendant's Terms of Service." Pl.'s Opp'n 5 (citing Def.'s Mot. 2).

I conclude, however, that "the design of the [2018 Account Creation Screen] and language used render the notice provided reasonable as a matter of California law." *Meyer*, 868 F.3d at 78. First, the screen was "uncluttered," *id.*, consisting only of instructions for creating an account, fields for the user to enter an email address and password, the words "Accept **Terms and Conditions**" directly adjacent to a checkbox, and a green button surrounding the words "CREATE ACCOUNT," Huq Decl. ¶ 7. Second, "the entire screen [was] visible at once, and the user d[id] not need to scroll beyond what [was] immediately visible to find notice of the Terms of Service." *Meyer*, 868 F.3d at 78; Huq Decl. ¶ 7. Third, the key "Accept **Terms and Conditions**" language was emphasized in bold, and this text, which included a hyperlink to the 2018 T&C, appeared just above the green "CREATE ACCOUNT" button. Huq Decl. ¶ 7. Fourth, the "CREATE ACCOUNT" button was "inoperable" unless and until the user affirmatively checked the checkbox, indicating "[a]ccept[ance]" of the hyperlinked "**Terms and Conditions**." *Id.* ¶ 8. As Molekule rightly points out, courts in this circuit "routinely uphold" similar clickwrap or click-through agreements, "which require users to click an 'I agree' box after being presented with a list of terms and conditions," because "the user has affirmatively assented to the terms of agreement by clicking 'I agree.'" *Meyer*, 868 F.3d at 75; *see* Def.'s Mot. 12.

Lastly, and contrary to Lepore's suggestion, Pl.'s Opp'n 5–6, the fact that the 2018 T&C

11

"were available only by hyperlink does not preclude a determination of reasonable notice." *Meyer*, 868 F.3d at 78–79. "As long as the hyperlinked text was itself reasonably conspicuous—and [I] conclude that it was—a reasonably prudent . . . user would have constructive notice of the terms." *Id.* at 79–80 ("While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice. . . . A reasonable user would know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not."); *see also, e.g.*, *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 292 (2d Cir. 2019).

Thus, because I find that Lepore unambiguously (and, apparently, undisputedly) assented to the 2018 T&C and that he was, at the very least, on inquiry notice of its terms, which included the arbitration provisions, I determine that the parties entered into an agreement to arbitrate, and Lepore is bound by its terms.

## II.     The Arbitration Agreement Delegates Threshold Arbitrability Questions.

I turn next to the terms of the parties' agreement to arbitrate, which is governed by the FAA. *See Johnston v. Electrum Partners LLC*, No. 17-CV-7823 (KPF), 2018 WL 3094918, at *6 (S.D.N.Y. June 21, 2018) ("The Court will apply federal law . . . to determine whether Plaintiff's claims fall within the scope of the arbitration agreement."); *Filanto, S.p.A. v. Chilewich Int'l Corp.*, 789 F. Supp. 1229, 1234 (S.D.N.Y. 1992) ("[F]ederal law governs issues relating to the arbitrability of a dispute."); Huq Decl., Ex. A at 9 ("The [FAA] will govern the interpretation and enforcement of this Section."). As an initial matter, I must address whether, as Molekule contends, the agreement contains "clear and unmistakable evidence" that the parties intended to delegate certain threshold arbitrability questions to the arbitrator, Def.'s Mot. 6–10; *see, e.g.*, *Henry Schein, Inc.*, 139 S. Ct. at 531. If so, then Lepore's arguments with respect to the scope and enforceability

of the arbitration agreement or the 2018 T&C as a whole, *see* Pl.'s Opp'n 6–9, must be addressed in the first instance by the arbitrator, rather than by me.[7]

Whether a court or an arbitrator is to answer threshold arbitrability questions "generally 'depends on whether the [arbitration clause] is a broad . . . or a narrow one.'" *Wells Fargo Advisors, L.L.C.*, 195 F. Supp. 3d at 547 (quoting *Edwards*, 2015 WL 4104718, at *10); *see Louis Dreyfus Negoce S.A. v. Bylstad Shipping & Trading, Inc.*, 252 F.3d 218, 224 (2d Cir. 2001). "If the clause is 'broad,' a court generally should compel arbitration and permit the arbitrator to decide whether the dispute falls within the arbitration clause." *Dodge Hyundai of Paramus*, 2011 WL 4356373, at *7 (citing *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 64 (2d Cir. 1983); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 121 (2d Cir. 1991)); *see also, e.g.*, *JSC Surgutneftegaz v. President & Fellows of Harvard Coll.*, 167 F. App'x 266, 268 (2d Cir. 2006) (summary order) ("[T]he extremely broad terms of the . . . arbitration clause plainly evince an intent to have the question of arbitrability decided by an arbitrator."); *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121–22 (2d Cir. 2003); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199–1200 (2d Cir. 1996). "If the clause is 'narrow,' the court must not compel arbitration unless the court first determines 'whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause.'" *Dodge Hyundai of Paramus*, 2011 WL 4356373, at *7 (quoting *Louis Dreyfus Negoce S.A.*, 252 F.3d at 224).

---

[7] Lepore misses the mark in maintaining that "the issue of whether the parties agreed to arbitrate the question of arbitrability need not be answered" because the 2018 T&C "represented an unconscionable and void contract." Pl.'s Opp'n 9–10. My determination of the extent to which the parties agreed to delegate threshold arbitrability issues necessarily precedes any consideration of the enforceability or validity of the parties' arbitration agreement or the 2018 T&C. Only if I determine that the parties did not intend to delegate such threshold arbitrability issues may I proceed to consider those very issues.

13

Further, "[t]he Second Circuit has held that where . . . a broad arbitration [clause] incorporates the [AAA Rules], the arbitrator and not the courts must decide . . . threshold issue[s] of arbitrability." *Pincaro v. Glassdoor, Inc.*, No. 16-CV-6870 (ER), 2017 WL 4046317, at *7 (S.D.N.Y. Sept. 12, 2017) (citing *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005)). This is because the AAA Rules provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA Rule 7(a). "[W]hen . . . parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp.*, 398 F.3d at 208; *see also Gwathmey Siegel Kaufman & Assocs. Architects, LLC v. Rales*, 518 Fed. App'x 20, 21 (2d Cir. 2013) (summary order) ("[B]y incorporating the [AAA Rules] the parties agreed to have the arbitrators decide arbitrability . . . ."); *JSC Surgutneftegaz*, 167 Fed. App'x at 268 ("The intent of the parties to commit the question of arbitrability to the arbitrator is further demonstrated by the incorporation of the [AAA Rules] . . . that empower the arbitrator to determine issues of arbitrability.").

I conclude that the 2018 T&C "clearly and unmistakably evidence[] the parties' intent to arbitrate questions of arbitrability." *Shaw Grp.*, 322 F.3d at 124–25; *see also, e.g.*, *Henry Schein, Inc.*, 139 S. Ct. at 527, 530. First, the arbitration agreement is a broad one. The "Agreement to Arbitrate" subsection of the 2018 T&C encompasses "any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services or Content." Huq Decl., Ex. A at 8. Courts in this circuit have found that an expansive delegation such as "any dispute, claim or controversy" itself provides "clear and unmistakable evidence" of an intent to arbitrate arbitrability. *See, e.g.*, *Shaw Grp.*, 322

14

F.3d at 121 ("[E]ven absent an express contractual commitment of the issue of arbitrability to arbitration, a referral of 'any and all' controversies reflects such a 'broad grant of power to the arbitrators' as to evidence the parties' clear 'inten[t] to arbitrate issues of arbitrability.'" (quoting *PaineWebber Inc.*, 81 F.3d at 1199–1200)). Yet the parties have also explicitly delegated "any dispute" relating to threshold questions of "enforcement, interpretation or validity." Huq. Decl., Ex. A at 8. This language unequivocally encompasses Lepore's arguments over whether the 2018 T&C or its arbitration agreement is unconscionable, or "whether a claim is within the scope of arbitration." *PaineWebber Inc.*, 81 F.3d at 1196–97 (finding clear and unmistakable evidence of delegation in agreement providing that "any and all controversies . . . concerning any account, transaction, dispute or the construction, performance, or breach of this or any other agreement . . . shall be determined by arbitration"); *see also, e.g.*, *McCoy*, 2018 WL 550637, at *7 (finding clear and unmistakable evidence of delegation in arbitration agreement encompassing "[a]ll claims, disputes, or controversies arising out of, or related to this Agreement, including but not limited to its validity, scope, interpretation, enforceability, performance, breach, or other challenge to the authority or capacity of any person signing this Agreement"); *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 52–53 (E.D.N.Y. 2017) (finding the same in arbitration agreement encompassing disputes "arising out of or relating to interpretation or application of this Arbitration Provision, including its enforceability, revocability or validity").

Second, the parties' broad arbitration agreement expressly incorporates the AAA Rules. Huq Decl., Ex. A at 9 (providing that any "arbitration will be administered . . . in accordance with [the AAA Rules]"). As discussed above, these rules "empower an arbitrator to decide issues of arbitrability." *Contec Corp.*, 398 F.3d at 208. Thus, their incorporation into the arbitration agreement "serves as clear and unmistakable evidence of the parties' intent to delegate such issues

15

to an arbitrator." *Id.*; *see also, e.g.*, *Gwathmey Siegel Kaufman*, 518 Fed. App'x at 21; *JSC Surgutneftegaz*, 167 Fed. App'x at 268; *McCoy*, 2018 WL 550637, at *7.

Having found that the parties' agreement to arbitrate clearly and unmistakably delegates threshold arbitrability issues to the arbitrator, I "must enforce this delegation [clause] unless the plaintiff has shown that the delegation [clause] itself is unenforceable." *Kuehn v. Citibank, N.A.*, No. 12-CV-3287 (DLC), 2012 WL 6057941, at *4 (S.D.N.Y. Dec. 6, 2012); *Corpus Christi Indep. Sch. Dist.*, 2019 WL 2051696, at *4; *McCoy*, 2018 WL 550637, at *7. Although Lepore raises more general challenges to the enforceability of the arbitration agreement and the 2018 T&C, nowhere does he specifically challenge the delegation clause. *See* Pl.'s Opp'n 6–9. Accordingly, Lepore's enforceability challenges must be deferred to the arbitrator. *See McCoy*, 2018 WL 550637, at *7–8 ("If . . . plaintiff challenges another provision of the arbitration agreement or the arbitration agreement as a whole, the court must 'treat [the delegation clauses] as valid . . . , leaving any challenge to the validity of the [arbitration] [a]greement as a whole for the arbitrator.'" (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010))); *Corpus Christi Indep. Sch. Dist.*, 2019 WL 2051696, at *4.

Thus, I determine that Lepore's claims must be referred to arbitration and that his arbitrability arguments must be addressed in the first instance by the arbitrator.

## CONCLUSION

For the reasons set forth above, Molekule's motion to compel arbitration is granted, and this case is stayed pending arbitration.[8]

---

[8] Molekule seeks a dismissal or stay of this case. The Second Circuit has held that the FAA "clearly removes" my discretion to dismiss or stay an action "when all claims are referred to arbitration and a stay [is] requested." *Katz v. Cellco P'ship*, 794 F.3d 341, 343, 346 (2d Cir. 2015). Here, Molekule requests a stay only as an alternative to dismissal, and plaintiff does not address the issue. *See Alfonso v. Maggies Paratransit Corp.*, 203 F. Supp. 3d 244, 253 n.13 (E.D.N.Y. 2016).

16

SO ORDERED.

Dated: April 12, 2021                                                               /s/
       Brooklyn, NY                                           Allyne R. Ross
                                                                    United States District Judge

---

Regardless, I find that "the same policy reasons relied on in *Katz* support a stay of the case here." *Id.* at 253. In particular, *Katz* emphasized "the FAA's underlying policy to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible" and to "enable[] parties to proceed to arbitration directly, unencumbered by the uncertainty and expense of additional litigation." 794 F.3d at 346 (citation and quotation marks omitted); *see also, e.g.*, *Castellanos v. Raymours Furniture Co., Inc.*, 291 F. Supp. 3d 294, 302 (E.D.N.Y. 2018) ("[T]he Court, in its discretion, stays the proceedings, particularly to promote expeditious resolution of this dispute.").